**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

United States of America,

        Plaintiff,

vs.

David Gonzalez-Saucedo,

        Defendant.

CR 12-01916-TUC-DCB (JR)

**REPORT AND RECOMMENDATION**

This matter was referred to Magistrate Judge Rateau for all pretrial matters. A Motion to Suppress (Doc. 37) filed by Defendant David Gonzalez-Saucedo was heard by Magistrate Judge Rateau on June 12, 2013. Defendant Gonzalez-Saucedo was present at the hearing and was represented by counsel. The Government presented five witnesses: United States Border Patrol Agents Adam Knight, Sean King, Patrick Ford, and Alberto Ontiveros; and Department of Public Safety Officer Rob Palmer. Defendant Gonzalez-Saucedo testified on his own behalf. The witnesses were examined, cross-examined, and questioned by the Court. Having

1

1  considered the matter, the Magistrate Judge submits the following Findings of Fact

2  and Conclusions of Law and recommends that Defendant Gonzalez-Saucedo's

3  Motion be denied.

4  **I.      Findings of Fact**

5       Defendant Gonzalez-Saucedo has suffered from asthma, which he usually

6  controls with an inhaler, since he was a child.  (Tr. 126-127.)  On the morning of

7  August 14, 2012, Gonzalez-Saucedo, then a resident of Tucson, was in Sierra Vista

8  when he had an asthma attack and, because he did not have his inhaler, went to the

9  emergency room at Sierra Vista Regional Medical Center.  (Tr. 127, 142.)   After

10  being at the hospital for an hour and a half and receiving a breathing treatment, he

11  was released with an inhaler and given prednisone.  (Tr. 128, Ex. 105 (medical

12  records).)

13       An hour or two after leaving the hospital, Gonzalez-Saucedo met a person at a

14  gas station near the hospital who asked him to drive a Camaro to a Dollar Store in

15  Tucson.  (Tr. 143-144.)  Gonzalez-Saucedo agreed to take the Camaro and began

16  traveling toward Tucson.  (Tr. 128.)

17       That same day, Border Patrol Agent Adam Knight was assigned to the

18  immigration checkpoint located on State Route 83 between Sonoita, Arizona and

19  Interstate 10.  (Tr. 7.)  However, due to scattered thunderstorms and standing water

20  on the road, the checkpoint was down and Agent Knight, who was in uniform and

21  driving an unmarked Ford 250 Super Duty K-9 truck, stationed himself about 20 feet

22  from the roadway at the northeast corner of the intersection of State Route 82, which

1   is an east/west traveling road, and State Route 83, which runs north/south, in the

2   town of Sonoita and began observing traffic.  (Tr. 7-8, 10.)  At the intersection, there

3   is only a stop sign for north/south traffic.  (Tr. 8.)  State Routes 82 and 83 are well

4   known to border patrol agents as trafficking routes.  (Tr. 33.)

5        At approximately 6:15 in the evening, Agent Knight saw a red or burgundy

6   Camaro, followed by a Dodge Ram pickup truck.  (Tr. 8-9, 45.)  He initially noticed

7   the vehicles because he had seen only one vehicle every 10 or 15 minutes while he

8   was stationed at the intersection and these vehicles were traveling in close

9   succession.  (Tr. 9.)  As the Camaro approached, Agent Knight noticed that the driver

10  was sitting awkwardly upright as if something was obstructing the seat causing it to

11  be pushed forward.  (Tr. 10, 66.)  The driver was sitting very close to the steering

12  wheel and had both of his hands at a 12 o'clock position on the wheel as he began to

13  make a right turn onto northbound State Route 83.  (Tr. 10.)  As the Camaro made

14  the turn, Agent Knight noticed the driver, after initially making eye contact,

15  repeatedly looked back and forth between the agent and the road.  (Tr. 10.)

16       Agent Knight's attention was then drawn to the Dodge Ram pickup following

17  ten to twelve feet behind the Camaro.  (Tr. 12.)  In that vehicle, there was a male

18  driver wearing a baseball cap and a female passenger, who looked directly at Agent

19  Knight as they passed.  (Tr. 12-13.)  When she saw him, "her expression was sort of

20  like feign shock, and then what she did is she turned to the driver and then dove into

21  his seat, dove across his lap as he was driving."  (Tr. 13.)  Agent Knight believed she

22  was "performing" and trying to get his attention.  (Tr. 13.)

3

1      Based on what he saw, Agent Knight decided to follow the vehicles.  He

2   pulled out and began traveling north on State Route 83 until he caught up with the

3   vehicles, which were traveling between 30 and 45 m.p.h. in a 55 m.p.h. zone, and

4   pulled in behind the Ram pickup.  (Tr. 13, 15-16.)  Shortly after he began following

5   the vehicles, he noticed the driver was watching him closely in his mirrors and also

6   saw the passenger "jump out of the lap of the driver" and began fixing her hair.  (Tr.

7   17.)   After noting the license plate number of the Dodge Ram, Agent Knight

8   attempted to pull around the pickup to and get in between it and the Camaro.  (Tr. 13-

9   14.)   However, the Ram pickup was still following the Camaro at a very close

10   distance and was swerving from the shoulder to median in an exaggerated manner

11   that the agent likened to the behavior of a drunk driver.  (Tr. 14-15.)  In fact, when

12   the agent would pull out to pass the Ram, the driver would quickly move the pickup

13   into the oncoming lane and Agent Knight was forced to pull back and remain behind

14   the pickup or it would remain so close to the Camaro that Agent Knight was unable

15   to pull in between the two vehicles.  (Tr. 15.)

16      After this happened several times over a period of six to ten minutes and a

17   distance of eight or nine miles, Agent Knight decided to pass both vehicles.  (Tr. 20.)

18   Traveling at the posted speed limit of 55 m.p.h., Agent Knight quickly gained

19   distance ahead of the Camaro and the Ram, and he then pulled over to the side of the

20   road and again began observing traffic.  (Tr. 21-22.)  Agent Knight eventually saw

21   the vehicles approaching, still traveling close together at approximately 35 to 40

22   m.p.h., and again noticed the behavior of the driver of the Camaro.  This time,

4

1  instead of looking at Agent Knight, the driver did not look over, but continued to

2  look forward.  (Tr. 22.)  However, the driver was still sitting in an upright position

3  and his hands were still in the awkward 12 o'clock position that Agent Knight

4  noticed when he first spotted the Camaro making the turn onto State Route 83.  (Tr.

5  22-23.)

6      As Agent Knight began to pull out to resume following the vehicles, he

7  noticed a third vehicle, a blue Chevrolet pickup, approaching from the south and

8  traveling at or just above the speed limit.  (Tr. 23-24.)  After the Chevrolet pickup

9  passed, he pulled back out onto SR 83 and all three of the vehicles he was following

10 began traveling at the 55 m.p.h. speed limit.  (Tr. 24.)  Agent Knight ran the license

11 plate of the Chevrolet and determined it was registered out of Bisbee, Arizona.  (Tr.

12 25.)  After a few miles, the vehicles all slowed to approximately 35 m.p.h.  (Tr. 25-

13 26.)  Then, after traveling through several passing zones, the Chevrolet eventually

14 passed both the Camaro and the Ram truck and Agent Knight pulled in again behind

15 the Dodge.  (Tr. 26.)  He then encountered a Cadillac Escalade parked on the side of

16 the road with its lights on observing traffic.  (Tr. 26-27.)  Agent Knight noticed the

17 Escalade because he had seen it at the SR 82/83 intersection approximately 20

18 minutes prior to the arrival of the Camaro and the Ram.  (Tr. 27.)  The Escalade

19 pulled in behind Agent Knight and continued traveling behind him as he followed the

20 other two vehicles northbound on SR 83.  (*Id*.)  Agent Knight ran a registration check

21 on the Escalade and was told it was registered out of Huachuca City, Arizona.  (Tr.

22

1   28-29.)   At the next available passing zone, the Escalade passed all three of the

2   vehicles, Agent Knight's truck, the Ram and the Camaro.  (Tr. 28.)

3          Now again traveling behind the Ram and Camaro, Agent Knight tried to pass

4   the Ram once more, but was prevented from doing so when the Ram moved into the

5   oncoming lane.   (Tr. 29.)   Still behind the Ram, Agent Knight activated his

6   emergency lights, which were in the front grill of his vehicle.  (Tr. 29-30)  The Ram

7   yielded and, as it pulled off onto the road shoulder, Agent Knight passed and pulled

8   in behind the Camaro.  (Tr. 29-30.)  He then was able to see the Camaro's license

9   plate and ran the registration and was told that the vehicle was recently purchased

10  and was registered out of Huachuca City, Arizona.  (Tr. 30.)

11         The Camaro then pulled over and stopped partially off the roadway, but

12  blocking a portion of the northbound lane of SR 83.  (Tr. 30-31.)  The Ram, which

13  was now behind Agent Knight, then accelerated quickly and sped northbound on SR

14  83.  (Tr. 31.)  Agent Knight then approached the passenger side of the Camaro so he

15  would not be in the road and in the backseat and floorboard, he noticed a black

16  sleeping bag that was covering large rectangular objects which he believed were

17  marijuana.  (Tr. 31, 35)  Agent Knight asked the driver for identification and he did

18  not have a driver's license, but provided an Arizona identification card indicating he

19  was David Saucedo-Gonzalez.  (Tr. 33.)

20         Gonzalez-Saucedo testified that when he was pulled over he was feeling

21  nauseated and was suffering from a cough and shortness of breath.   However,

22  according to Agent Knight, Gonzalez-Saucedo did not appear to be in any physical

6

1    distress when he engaged him  in conversation.  (Tr. 132, 33.)  Gonzalez-Saucedo

2    testified that he requested medical attention and was ignored.  Agent Knight, who has

3    first responder training, did not recall such a request and did not notice any distress.

4    (Tr. 132-133, 147, 34, 40.)  Agent Knight did notice that Gonzalez-Saucedo's hands

5    were noticeably shaking when he was manipulating his wallet to remove his

6    identification.   (Tr. 33-34.)   When questioned, Gonzalez-Saucedo said he was

7    coming from Sierra Vista and that the Camaro belonged to a friend by the name of

8    Joe Dominguez.  Agent Knight determined that the vehicle had never been registered

9    to a person by that name.  (Tr. 34-35.)

10          Agent Knight requested to see the identifying documents related to the

11   vehicle, but Gonzalez-Saucedo was unable to produce them and was searching the

12   vehicle for any paperwork associated with the vehicle.  (Tr. 35.)  Because he could

13   not see what Gonzalez-Saucedo was reaching for, Agent Knight asked him to exit the

14   vehicle.   (Tr. 35-36.)   After determining he was a legally admitted permanent

15   resident, Agent Knight escorted him to the rear of the vehicle, performed a *Terry*

16   frisk, and obtained Gonzalez-Saucedo's consent to search the vehicle.   (Tr. 36.)

17   Agent Knight then went to his service vehicle and returned with his K-9 to perform

18   an exterior sniff of the Camaro.  (*Id.*)  The K-9 alerted by following the scent from an

19   open window, then jumping into the vehicle without command and sitting.  (Tr. 37.)

20          Agent Knight asked Gonzalez-Saucedo about the contents of the Camaro and

21   he denied he was responsible, saying it was not even his car.  (Tr. 37.)  Agent Knight

22   then returned the dog to his service vehicle, returned to the Camaro and leaned in to

7

1   visually inspect the car.  (*Id*.)  He saw brown packaging tape and smelled what he

2   believed to be marijuana.  (Tr. 38.)  He then took Gonzalez-Saucedo into custody by

3   handcuffing him and sitting him down next to his service vehicle.  (*Id*.)  While Agent

4   Knight questioned about biographical information, Gonzalez-Saucedo became

5   emotional and said, "This will ruin my life.  I have children.  I'm unable to take care

6   of, pay for my [asthma] medication."  (Tr. 38-39.)

7          Shortly after Agent Knight placed Gonzalez-Saucedo in custody, Supervisory

8   Border Patrol Agent Sean King arrived on the scene and read him his *Miranda*

9   warnings.  (Tr. 40-41, 91.)  After placing Gonzalez-Saucedo in the back of a Border

10  Patrol SUV, Agents King and Knight questioned him and he claimed that he had

11  obtained the vehicle through a friend, John Spatco.  He admitted picking it up at the

12  Veterans Memorial Park in Sierra Vista and that he had seen the Cadillac Escalade at

13  the park.  (Tr. 41, 42, 93.)  He also admitted that he knew that there was marijuana in

14  the vehicle when he picked it up and that he was going to be paid to deliver it to

15  Tucson.  (Tr. 42.)

16         After 20 or 30 minutes of questioning, although he still appeared to Agent

17  Knight to be in no distress, Gonzalez-Saucedo expressed concerns about his asthma,

18  saying he was experiencing a shortness of breath.  (Tr. 42-43, 44, 92-93.)  The agents

19  discontinued questioning and Agent King called for an EMT certified agent to

20  respond to the scene.  (Tr. 43.)  Officer Rob Palmer, who was EMT trained, from the

21  Department of Public Safety arrived on the scene.  (Tr. 98.)  He described Gonzalez-

22  Saucedo as handcuffed, calm and cooperative at the time (Tr. 100.)  He did not

1    observe any shortness of breath and noted that "everything seemed fine" when he

2    arrived.  (*Id*.)  Gonzalez-Saucedo did not immediately request medical care, but when

3    it started raining heavily, he was moved into the backseat of Officer Palmer's SUV

4    and, five or ten minutes later, began complaining of chest pains.  (Tr. 101-102.)

5         Officer Palmer immediately assessed his vital signs and placed him on

6    oxygen.  The officer observed that Gonzalez-Saucedo was "starting to have a little bit

7    of shortness of breath" and was becoming flushed.  (Tr. 102.)  He did not have an

8    oxygen monitor and therefore was unable to determine the oxygen levels in

9    Gonzalez-Saucedo's body, so he requested additional assistance from Border Patrol

10   Agent Patrick Ford, who was also in the area.  (Tr. 102-103.)  Gonzalez-Saucedo

11   remained in Officer Palmer's vehicle with the air conditioning on and was not being

12   questioned.  (Tr. 103, 111.)  Agent Ford arrived and also assessed Gonzalez-Saucedo,

13   finding his vitals within normal limits except for his breathing, which was rapid and

14   shallow with some wheezing.  (Tr. 103, 109-110.)   Due to Gonzalez-Saucedo's

15   complaints of chest pain, the decision was made to call an ambulance, which arrived

16   in approximately 15 minutes.  (Tr. 103-104, 112.)  Gonzalez-Saucedo was then taken

17   from the scene and transported to Kino Hospital in Tucson.  (Tr. 134, 78-79, 104,

18   111.)

19        Early the following morning, Gonzalez-Saucedo was returned to custody at

20   the Sonoita Border Patrol Station and, beginning at just after 3:00 a.m. and ending

21   before 3:15 a.m., was questioned and videotaped by Agent Alberto Ontiveros.  (Tr.

22   114, 117, 135, 149; Ex. 3 (video recording).)  Agent Ontiveros recalls that Gonzalez-

1   Saucedo was still experiencing some asthma symptoms and he offered him water and

2   coffee, but during the interviews, Gonzalez-Saucedo did not appear to be in physical

3   distress and he did not request medical attention.  (Tr. 115-116, 121.)  After reading

4   him his *Miranda* warnings on the video recording, Gonzalez-Saucedo agreed to talk

5   with Agent Ontiveros without a lawyer present.  (Tr. 119.)  After the video interview

6   concluded, Gonzalez-Saucedo was further questioned for intelligence-gathering

7   purposes.  (Tr. 120.)  Gonzalez-Saucedo claims that he collapsed as he was being

8   returned to his cell, however, medical records reflect that later that morning

9   Gonzalez-Saucedo was transported by ambulance to Sierra Vista Regional Medical

10  Center, leaving the Sonoita station shortly after 9:00 a.m. and admitted  to the

11  hospital at 9:51 a.m.  (Tr. 136; Ex. 107 (medical records).)

12  **II.      Conclusions of Law**

13          **A.      The stop was supported by reasonable suspicion.**

14          Gonzalez-Saucedo moves to suppress the evidence seized following the stop

15  of the vehicle in which he was traveling.  The Fourth Amendment protects the right

16  of the people to be secure in their person, houses, papers, and effects against

17  unreasonable searches and seizures.  *U.S. v. Hensley*, 469 U.S. 221, 226 (1985).  In

18  *Terry v. Ohio*, 392 U.S. 1, 88 (1968), the Supreme Court held that, consistent with

19  the Fourth Amendment, police may stop persons in the absence of probable cause

20  under limited circumstances.  The Court has held that law enforcement agents may

21  briefly stop a moving automobile to investigate a reasonable suspicion that its

22  occupants are involved in criminal activity.  *Hensley*, 469 U.S. at 226.

1    Reasonable suspicion exists when an officer is aware of specific articulable

2  facts, that, together with rational inferences drawn from them, reasonably warrant a

3  suspicion that the person to be detained has committed or is about to commit a crime.

4  *United States v. Cortez*, 449 U.S. 411, 416-18 (1981).  The articulable facts forming

5  the basis of a reasonable suspicion must be measured against an objective

6  reasonableness standard, not by the subjective impressions of a particular officer.

7  *Gonzalez-Rivera v. INS*, 22 F.3d 1441, 1445 (9th Cir.1994).  When assessing the

8  reasonableness of the police officer's actions, the court must consider the totality of

9  the circumstances which confronted the officer at the time of the stop.  *United States*

10  *v. Sokolow*, 490 U.S. 1, 8 (1989).  In relation to stops by the border patrol, the totality

11  of circumstances may include:

12         (1) characteristics of the area; (2) proximity to the border; (3) usual
            patterns of traffic and time of day; (4) previous alien or drug smuggling
13         in the area; (5) behavior of the driver, including obvious attempt to
            evade officers; (6) appearance or behavior of passengers; (7) model and
14         appearance of the vehicle; and, (8) officer experience.

15  *United States v. Berber-Tinoco*, 510 F.3d 1083, 1087 (9th Cir. 2007) (quoting *United*

16  *States v. Garcia-Barron*, 116 F.3d 1305, 1307 (9th Cir. 1997)).  In this case, the Court

17  must ascertain whether the factors cited by the Government in support of the stop

18  constitute behavior that should excite the suspicion of a trained border patrol agent

19  that criminal activity is afoot.  *See United States v. Rodriquez,* 976 F.2d 592, 595 (9th

20  Cir. 1992) amended by *United States v. Rodriquez*, 997 F.2d 1306 (9th Cir. 1993).

21         In the Response to the motion to suppress and at the hearing, the Government

22  cited Agent Knight's experience and awareness that smuggling operations are

1   common in the Sonoita area, particularly when the border checkpoint is not

2   operational.  In addition to these general factors, the Government argues that the stop

3   was also supported by Gonzalez-Saucedo's driving posture and hand position on the

4   steering wheel, that the Camaro appeared to be traveling in tandem with the Dodge

5   Ram, and the suspicious actions of the driver and passenger in the Ram.  These

6   factors are considered individually and collectively.

7                   **1.        Proximity to the Border**

8            Agent Knight testified that he is familiar with the area around Sonoita and that

9   his suspicions are supported by the town's proximity to the border and the history of

10  alien and drug smuggling in the area.  He also noted that the border checkpoint in the

11  area was closed at the time due to inclement weather.  The cases indicate that these

12  factors are entitled to a varying degree of weight.  The Ninth Circuit has stated that

13  "[a] location or route frequented by illegal immigrants, but also by many legal

14  residents, is not significantly probative to an assessment of reasonable suspicion."

15  *United States v. Manzo-Jurado*, 457 F.3d 928, 936  (9th Cir. 2006).   For example, if

16  the road regularly carries alien and drug smugglers, but also carries a large volume of

17  legitimate traffic, this factor carries little weight.  *See United States v. Brignoni-*

18  *Ponce*, 422 U.S. 873, 882 (1975).  However, if the road is a remote, unpaved road

19  that is rarely traveled except when used by smugglers to avoid detection and arrest,

20  this factor would be entitled to greater consideration in the reasonable suspicion

21  calculation.  *See United States v. Arvizu*, 534 U.S. 266, 269 (2002).

22

1    Here, Agent Knight's suspicions were initially raised because the driver of the

2    Camaro was driving awkwardly and was being closely followed by the Ram, whose

3    occupants engaged in behavior that he believed was intended to distract his attention

4    from the Camaro.  Of course there is nothing inherently suspicious about vehicles

5    traveling on a public highway.  *See United States v. Rodriquez*, 976 F.2d 592, 595

6    (9th Cir. 1992).  It is also notable that the road is paved and Agent Knight described

7    it as being used to commute between Sonoita and the Tucson area.  That would

8    suggest that the road was in regular use.  As such, this factor does deserve some

9    weight given Sonoita's proximity to the border and the amount and frequency of

10   alien and drug smuggling activity in the area.

### 2.   Behavior of the Driver

12   Agent Knight described several credible factors that raised his suspicions

13   about Gonzalez-Saucedo.  When he initially saw Gonzalez-Saucedo, he noticed that

14   he was sitting awkwardly upright and very close to the steering wheel, suggesting

15   that something was preventing him from moving the seat back.  He also noticed that

16   Gonzalez-Saucedo repeatedly looked back and forth from the road to the agent.  The

17   latter factor became more significant later when Agent Knight passed the Camaro

18   and the Ram and allowed them to pass him again as he sat by the road.  At the time

19   of the second contact, Gonzalez-Saucedo did not look at the agent, but kept looking

20   forward at the road.  Although the Court typically does not put great weight on the

21   consideration of whether a driver does or does not make eye contact with an agent, in

22   this case there was both what could be described as nervous eye contact initially

13

1  coupled with a refusal to make eye contact later.  When considered with the driver's

2  upright and awkward driving position, these factors do carry some weight in the

3  reasonable suspicion calculus in this case.

4           **3.      Tandem Driving**

5           Traveling in tandem, although not sufficient on its own to establish founded

6  suspicion, is a factor that can be considered.  *United States v. Larios-Montes*, 500

7  F.2d 941, 943-44 (9th Cir. 1974); *United States v. Montero-Camargo*, 208 F.3d 1122,

8  1139 (9th Cir. 2000) (holding that tandem driving could be given some weight in

9  evaluation of reasonable suspicion).  However, the determination that vehicles are

10  driving in tandem must be based on more than the "briefest of observations."  *United*

11  *States v. Robert L.*, 874 F.2d 701, 704 (9th Cir. 1989).  Where it is relied upon to

12  support reasonable suspicion, the evidence of tandem driving must be detailed and

13  substantial.  *See United States v. Medina-Gasca*, 739 F.2d 1451, 1453 (9th Cir. 1984)

14  (extended observation of three vehicles traveling close together, parking together and

15  then traveling again in tandem).

16           In this case, when Agent Knight first spotted the Camaro and Ram truck, he

17  was in a stationary position alongside the road.  He immediately noticed that the

18  vehicles were traveling closely together.  Then, the female passenger in the Ram

19  "feigned" concern and dove into the lap of the driver.  This suggested to Agent

20  Knight that the occupants in the Ram were attempting to draw his attention to

21  themselves and away from the Camaro.  Agent Knight's initial suspicion was further

22  supported by the maneuvering of the Ram when Agent Knight attempted to pass it

14

1   and pull in behind the Camaro.  The Ram was variously pulling into oncoming traffic

2   to prevent Agent Knight's attempt to overtake, or would pull so close to the Camaro

3   that Agent Knight was unable to pull in behind the Camaro.  Finally, both vehicles

4   were traveling below the posted speed limit, but the Ram never attempted to pass the

5   Camaro.  Thus, in this case, the evidence of tandem driving is significant and this

6   factor deserves great weight in the evaluation of reasonable suspicion.

7                    **4.       Totality of the Circumstances**

8         In deciding whether the totality of the circumstances establish reasonable

9   suspicion, it is inappropriate to consider each factor in isolation or to give no weight

10  to factors for which an innocent explanation may exist.  *United States v. Arvizu*, 534

11  U.S. 266, 274 (2002).  Considering in totality the factors identified by Agent Knight,

12  the Court concludes they are sufficient to establish the reasonable, particularized

13  suspicion necessary to support the investigative stop of the Camaro driven by

14  Gonzalez-Saucedo.

15         **B.      Gonzalez-Saucedo's statements were voluntary.**

16        Gonzalez-Saucedo contends that his statements to the agents must be

17  suppressed because the stop of his vehicle was illegal and because his medical

18  condition was used to force him to provide a statement in exchange for favorable

19  treatment.  As discussed above, the Court finds that the stop was supported by

20  reasonable suspicion and therefore does not provide a basis for suppression of

21  Gonzalez-Saucedo's statement.  Moreover, the Court also concludes that the

22  statements were voluntary.

1    As a threshold matter, the obligation to provide *Miranda* warnings attaches

2    once a person is subject to "custodial interrogation."   *Miranda v. Arizona*, 384 U.S.

3    436, 445 (1966).  Custody turns on whether there is a formal arrest or a restraint on

4    freedom of movement of the degree associated with formal arrest.   *United States v.*

5    *Rodriguez-Preciado*, 399 F.3d 1118, 1127 (9th Cir. 2005), *amended by United States*

6    *v. Rodriguez-Preciado*, 416 F.3d 939 (9th Cir. 2005).   There is no dispute that

7    Gonzalez-Saucedo was in custody during his roadside interrogation and the later

8    interrogation at the station.  It is also undisputed that he was provided and waived his

9    *Miranda* rights on both occasions.

10    Despite receiving his *Miranda* warnings, Gonzalez-Saucedo nevertheless

11    claims his statements were involuntary.  A confession is involuntary if it is not "the

12    product of a rational intellect and a free will."  *Brown v. Horell*, 644 F.3d 969, 979

13    (9th Cir. 2011) (citing *Townsend v. Sain*, 372 U.S. 293, 307 (1963).  "The test is

14    whether, considering the totality of the circumstances, the government obtained the

15    statement by physical or psychological coercion or by improper inducement so that

16    the suspect's will was overborne."  *Beaty v. Schriro*, 509 F.3d 994, 999 (9th Cir.

17    2007).  A statement may also be considered involuntary if it is extracted by any sort

18    of threat or violence, or "obtained by any direct or implied promises, however slight,

19    [or] by the exertion of any improper influence."  *Id*.

20    Gonzalez-Saucedo claims that Agents Knight and King were aware that he

21    was having medical issues, but nevertheless continued questioning him even while he

22    was getting treatment.  However, Officer Palmer and Agent Ford contradicted this

16

1    contention.   They were charged with treating Gonzalez-Saucedo at the scene and

2    both testified that he was not being questioned at that time.  In fact, they did not even

3    find Gonzalez-Saucedo was in acute distress, only sending him to the hospital via

4    ambulance because they were concerned not with his breathing and oxygen

5    saturation, but with his complaints of chest pain.  Additionally, the fact that Agent

6    Knight called the EMTs to the scene undermines Gonzalez-Saucedo's contention that

7    the agent was using his condition to leverage a statement from him.

8            Gonzalez-Saucedo also contends that his statement at the Sonoita station given

9    to Agent Ontiveros was involuntary because he was struggling with asthma and was

10   told that he had until the ambulance arrived to cooperate or they could no longer help

11   him.   (Tr. 133.)   A review of the video recording of the statement undermines

12   Gonzalez-Saucedo's contention that he was visibly suffering.  (Ex. 3.)  While the

13   recording does illustrate that he was coughing, it discloses no obvious signs that he

14   was in the type of distress that needed immediate medical attention.  He was quiet

15   and cooperative and said nothing to the agents about his asthma.   Additionally,

16   Gonzalez-Saucedo's claims that he had until the ambulance arrived to copperate is

17   not supported by the documented timing of the evening.  The recorded portion of the

18   interview was over by 3:14 a.m. on August 15, 2012 (Ex. 3), and he was not sent to

19   the hospital until around 9:00 a.m.  (Ex. 107.)  Thus, the unrecorded portion of the

20   interview would have had to have taken approximately five hours if Gonzalez-

21   Saucedo's version of events is to be believed.  Given that the recorded portion of the

22   interview was under 15 minutes, and the unrecorded portion was reported as being

17

1   approximately twice that long, the entire interview would have ended no later than

2   about 4:00 a.m., or approximately five hours before Gonzalez-Saucedo was taken to

3   the hospital.  There is nothing in the record that would support Gonzalez-Saucedo's

4   contention that he went from the interview directly to the hospital.  Thus, considering

5   the totality of the circumstances surrounding the interview, the Court finds that the

6   second statement, like the first, was entirely voluntary.

7   **III.      Recommendation for Disposition by the District Judge**

8           Based on the foregoing and pursuant to 28 U.S.C. § 636(b) and Local Rule

9   Civil 72.1, Rules of Practice of the United States District Court, District of Arizona,

10  the Magistrate Judge recommends that the District Court, after an independent review

11  of the record, DENY the Motion to Suppress (Doc. 37) filed by Defendant David

12  Gonzalez-Saucedo.

13          This Recommendation is not an order that is immediately appealable to the

14  Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Rule 4(a)(1),

15  Federal Rules of Appellate Procedure, should not be filed until entry of the District

16  Court's judgment.  However, the parties shall have fourteen (14) days from the date

17  of service of a copy of this recommendation within which to file specific written

18  objections with the District Court.  See 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a)

19  and 6(e) of the Federal Rules of Civil Procedure. Thereafter, the parties have ten (10)

20  days within which to file a response to the objections. No replies are permitted

21  without leave of court.  If any objections are filed, this action should be designated

22  case number: **CR 12-1916-TUC-DCB**.   Failure to timely file objections to any

1    factual or legal determination of the Magistrate Judge may be considered a waiver of

2    a party's right to de novo consideration of the issues.   *See United States v. Reyna-*

3    *Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).

4              Dated this 4th day of July, 2013.

5

6

7    _____

8                    Jacqueline M. Rateau
                  United States Magistrate Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22